## PEOPLE *v.* DETTENTHALER.

PEOPLE, *ex rel.* GROSVENOR, *v.* CALKINS.

1. CONSTITUTIONAL LAW—CONSTRUCTION—STYLE OF STATUTES.
   No constitutional provision will be construed as merely directory. So *held* in a case involving the validity of a statute in the passage of which article 4, § 48, of the State Constitution, requiring the style of laws to be, "The People of the State of Michigan enact," was disregarded.

2. SAME—AMENDMENT—LEGISLATIVE PROCEEDINGS—EVIDENCE.
   Parol evidence that the clerk of the house of representatives noticed the absence of an enacting clause in a senate bill previous to its passage by the house, and brought the matter to the attention of the house, stating that he would enter such a clause, and that he did so before returning the bill to the senate with the advice that it had been so amended by the house, if admissible at all, is insufficient to show an authorized amendment.

3. SAME—GOVERNOR'S SIGNATURE.
   The fact that an enacting clause, which was not a part of an act as passed by the legislature, was supplied before the act was presented for the governor's signature, does not make the act when signed by him a valid law.

4. SAME—OLEOMARGARINE LAW.
   Under the foregoing principles, Act No. 76, Pub. Acts 1897,

118   595
134   446
118   595
135   ²562

entitled "An act to prevent deception in the manufacture and sale of imitation butter," is unconstitutional.

Exceptions before judgment from superior court of Grand Rapids; Burlingame, J. *Certiorari* to Jackson; Peck, J. Submitted April 19, 1898. Decided December 6, 1898.

Frank J. Dettenthaler was convicted of selling oleomargarine in violation of Act No. 76, Pub. Acts 1897. Reversed.

*Mandamus* by the people of the State of Michigan, on the relation of Elliott O. Grosvenor, dairy and food commissioner, to compel J. Jay Calkins, police justice of the city of Jackson, to issue a warrant for the arrest of Henry A. Lincoln, charged with selling oleomargarine in violation of Act No. 76, Pub. Acts 1897. From an order denying the writ, relator brings *certiorari*. Affirmed.

*Rood & Hindman* and *E. F. Sweet*, for appellant Dettenthaler and respondent Calkins.

*Fred A. Maynard*, Attorney General, and *Frank A. Rodgers*, Prosecuting Attorney (*John G. Hawley* and *Rodgers, McDonald & Corwin*, of counsel), for the people.

HOOKER, J. These cases involve the validity of Act No. 76, Pub. Acts 1897, which is as follows:

"An Act to prevent deception in the manufacture and sale of imitation butter.

"SECTION 1. *The People of the State of Michigan enact,* that no person, by himself or his agents or servants, shall render or manufacture, sell, offer for sale, expose for sale, or have in his possession with intent to sell, any article, product, or compound made wholly or in part out of any fat, oil, or oleaginous substance or compound thereof not produced from unadulterated milk or cream from the same, which shall be in imitation of yellow butter produced from pure unadulterated milk or cream from the

same: *Provided,* that nothing in this act shall be construed to prohibit the manufacture or sale of oleomargarine in a separate and distinct form, and in such manner as will advise the consumer of its real character, free from coloration or ingredient that causes it to look like butter.

"SEC. 2. Whoever violates any of the provisions of section one of this act shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than fifty dollars, nor more than five hundred dollars, and the costs of prosecution, or by imprisonment in the county jail, or state house of correction and reformatory at Ionia, for not less than six months nor more than three years, or by both such fine and imprisonment, in the discretion of the court, for each and every offense.

"Approved April 15, 1897."

The evidence in the first-entitled cause shows that the defendant was convicted of the alleged offense of selling oleomargarine in contravention of this act. In the other, a complaint was made of a similar act to a justice, who refused to issue the warrant; and, on application, the circuit court denied a *mandamus* to compel it. The cases raise substantially the same questions, and were argued, and will be considered, together.

The validity of the law is questioned. The record shows that this was a senate bill, and passed the senate without the constitutional enacting clause. The records of the house show that the bill was reported by the committee on agriculture and the committee of the whole without amendment, and with the recommendation that it be passed. Under the head of "Third Reading of Bills upon Passage," the record of the house shows that:

"Pending the third reading of the bill, Mr. Chamberlain moved that the bill be recommitted to the committee of the whole, which motion did not prevail. The bill having been read a third time, and the question being upon its passage, pending the taking of the vote Mr. Graham demanded the previous question. The demand was seconded. The question being, 'Shall the main question be now put?' the same was ordered. The bill was then passed, a majority of all the members-elect voting therefor by yeas and nays as follows: Yeas, 56; nays, 19."

As this is the only time the bill was before the house, we must find that the bill passed the house without an enacting clause, unless the contrary can be shown by other evidence. Counsel undertook to show that it was amended in this particular by the records of the senate and the testimony of the clerk of the house. The evidence is, in brief, that, previous to the passage of the bill in the house, the clerk noticed the absence of the enacting clause, and brought it to the attention of the house, and said that he would enter one, and accordingly wrote the words in the original bill; *i. e.*, the one which was then before the house. He did not testify that the house took any action upon it, or that any record was made of it. The senate record shows that the bill was subsequently returned to the senate, accompanied by a letter from the clerk of the house, reading as follows:

"HOUSE OF REPRESENTATIVES,
"LANSING, April 7, 1897.
"TO THE PRESIDENT OF THE SENATE.

"*Sir:* I am instructed by the house to return to the senate the following bill : Senate bill No. 6, file No. 24, entitled 'A bill to prevent deception in the manufacture and sale of imitation butter,'—and to inform the senate that the house has amended the same as follows: By inserting in line 1, section 1, after the words 'Section 1,' the words, 'The People of the State of Michigan enact.'
"Very respectfully,
"LEWIS M. MILLER,
"Clerk of the House of Representatives.

"In the passage of which, as thus amended, the house has concurred by a majority vote of all the members-elect."

It further appears that the senate concurred in such amendment.

We must determine, therefore, whether the house is shown to have amended the bill by inserting an enacting clause, and, if not, whether the law is valid without it. The most that can be claimed is that there is oral testimony that the clerk announced its absence, and stated that he would supply it. Inferentially, perhaps, we may say

that there was no objection made; but the evidence is silent as to what, if anything, occurred. There is nothing but this inference of silence which imports acquiescence in the amendment. There is nothing to show definite action by the house, which alone had power to amend the bill be- fore it. So that, if the clause is essential to the validity of the act, we need not discuss the propriety of admitting parol evidence to prove an amendment which should be shown by the record if one was authorized. See *Attorney General* v. *Rice*, 64 Mich. 391; *Hart* v. *McElroy*, 72 Mich. 446 (2 L. R. A. 609); *Sackrider* v. *Board of Sup- ervisors of Saginaw Co.*, 79 Mich. 66.

Is the constitutional enacting clause a requisite to a valid law? This must depend upon whether the constitu- tional provision is to be considered a mandatory provision or directory merely. See Const. Mich. art. 4, § 48. Among the authorities cited by the relator in support of his contention is that of *Swann* v. *Buck*, 40 Miss. 268. The constitutional provision is similar to ours, and it was held that a substantial compliance was sufficient. In that case the style of the resolution was, "Resolved by the legislature of the State of Mississippi." The court was unable to dis- cover a previous judicial decision of the question, but quoted Mr. Cushing to the effect that the prescribed "form must be strictly pursued, and that no equivalent language will be sufficient," and, while declining to accept his rule, said:

"*It is necessary that every law should show on its face the authority by which it is adopted and promul- gated, and that it should clearly appear that it is in- tended by the legislative power that enacts it that it should take effect as a law.* These conditions being ful- filled, all that is absolutely necessary is expressed. The word 'resolved' is as potent to declare the legislative will as the word 'enacted.'"

The case of *McPherson* v. *Leonard*, 29 Md. 377, held that the provision of the constitution of Maryland was directory, and that the omission of the words, "by the

general assembly of Maryland," did not render the law invalid. The question appears to have been treated as a new one. The case of *City of Cape Girardeau* v. *Riley*, 52 Mo. 427 (14 Am. Rep. 427), follows the Maryland case in holding the provision directory; the court saying that, after diligent search, no case holding to the contrary had been found. In this case, like the one before us, the entire enacting clause was wanting. In this connection we may add that previous decisions of the same court, holding the provision that writs should run in the name of the State was directory, were given weight. In our State a contrary holding will be found. See *Forbes* v. *Darling*, 94 Mich. 621. There are, however, cases which take a contrary view of the law, and adhere to the doctrine asserted by Mr. Cushing, and the late Mr. Justice COOLEY, in his work on Constitutional Limitations (page 93, 6th Ed.), viz.:

"But the courts tread upon very [dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done, and they must then be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules, by which all departments of the government must at all times shape their conduct; and, if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument, and usurping the proper province of ordinary legislation. We are not, therefore, to expect to find in a constitution provisions which the people in adopting it have not regarded as of high importance, and worthy to be embraced in an instrument which, for a time, at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a

power should be exercised, there is at least a strong pre-
sumption that the people designed it should be exercised
in that time and mode only; and we impute to the people
a want of due appreciation of the purpose and proper
province of such an instrument when we infer that such
directions are given to any other end,—especially when,
as has already been said, it is but fair to presume that the
people in their constitution have expressed themselves in
careful and measured terms, corresponding with the im-
mense importance of the powers delegated, and with a
view to leave as little as possible to implication."

There are some cases, however, where the doctrine of
directory statutes has been applied to constitutional pro-
visions; but they are so plainly at variance with the weight
of authority upon the precise points considered that we
feel warranted in saying that the judicial decisions, as
they now stand, do not sanction the application.   The
question arose in Washington Territory, over a law fixing
the seat of government, and the opinion of Cushing was
quoted and followed.   *In re Seat of Government Case*,
1 Wash. T. (N. S.) 116.   The case of *State* v. *Rogers*
(decided in 1875), 10 Nev. 250 (21 Am. Rep. 738), did
the same.   An extended discussion of the subject will be
found in that case, in support of the proposition that the
language of the constitution should .be literally followed.
The opinion concludes with the following pertinent and
emphatic language:

"Our constitution expressly provides that the enacting
clause of every law shall be,  'The people of the State of
Nevada, represented in senate and assembly, do enact as
follows.'   This language is susceptible of but one interpre-
tation.   There is no doubtful meaning as to the intention.
It is, in our judgment, an imperative mandate of the
people, in their sovereign capacity, to the legislature, re-
quiring that all laws, to be binding upon them, shall, upon
their face, express the authority by which they were en-
acted; and, as this act comes to us without such authority
appearing upon its face, it is not a law."

The case of *State* v. *Patterson*, 98 N. C. 662, is strong
in its condemnation of the practice of treating constitu-

tional requirements as directory. The case of *Powell* v. *Jackson Common Council*, 51 Mich. 129, is not in point, as the bill was duly and seasonably amended, if we may accept the statement of the briefs of the counsel and the syllabus. The trend of the weight of the authority is, in our opinion, against the relator's contention.

It is urged with some plausibility that the insertion of this provision previous to the signature by the governor is a sufficient compliance with the Constitution, from which we understand the claim to be made that, although the enacting clause was wanting when the bill came to the governor, it might have been supplied by him. But it is thought that this proposition is tenable only upon the assumption that the constitutional provision is directory merely. The governor has no power to make laws. The legislative power is in no part vested in him, being by section 1 of article 4 of the Constitution vested in the senate and house of representatives. It is not the design of the Constitution that he should legislate. His office is a check upon the legislature, and he may compel a reconsideration of a bill by seasonably returning it to the appropriate house with his objections to it, and, when the legislature has adjourned, his neglect to sign it prevents it from becoming a law; but he has not the slightest power in framing the law. Indeed, it is a fundamental principle in American constitutions that the executive shall not make laws. The following language from the opinion in the case of *State* v. *Rogers*, 10 Nev. 250 (21 Am. Rep. 738), is *apropos* to this subject:

"Without the concurrence of the senate, the people have no power to enact any law. Every person at all familiar with the practice of legislative bodies is aware that one of the most common methods adopted to kill a bill, and prevent its becoming a law, is for a member to move to strike out the enacting clause. If such motion is carried, the bill is lost. Can it be seriously contended that such a bill, with its head cut off, could thereafter, by any legislative action, become a law? Certainly not. The certificates of the proper officers of the senate and assembly

that such an act was passed in their respective houses do not and could not impart vitality to any act which upon its face failed to express the authority by which it was enacted."

This being so, the only justification for the insertion of the enacting clause by the governor is to be found in the assumption that it is a clerical omission of an unimportant matter; and it might as well be held that one of the houses, or a clerk, or even the printer of the laws, might make the correction, as that the governor might do it.

Some of the States have sustained laws without enacting clauses, but we do not know of one that has made their validity depend upon the unauthorized action of some officer or person. They have preferred to rest their action upon the well-recognized distinction between mandatory and directory provisions. If the provision is mandatory that the law shall have a prescribed style, and the making of laws is confined to the legislative branch of the government, it cannot be consistently held that omissions of essential parts of a law may be supplied and corrections made by persons without authority; and the public necessities should be much greater than in the present case before such a proposition should be seriously considered. If, on the other hand, there is warrant for treating the provision as directory, a much less dangerous precedent is established. But, as has been shown, the weight of authority forbids it; and, in our opinion, it will be an unfortunate day for constitutional rights when courts begin the insidious process of undermining constitutions by holding unambiguous provisions and limitations to be directory merely, to be disregarded at pleasure. In the present case it will be much better that the legislature shall correct its mistake than that the courts shall sanction the irregular correction.

We are therefore constrained to hold that the law under discussion is void, and in the *certiorari* case the order is affirmed; in that of Dettenthaler the conviction is reversed, and no new trial ordered.

The other Justices concurred.